1

2

3

4

5

6

7

8                       IN THE UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10   HENRY JOHN MULLER III,

11          Plaintiff,                           No. CIV S-05-1390 GEB GGH PS

12      vs.

13   SACRAMENTO COUNTY SHERIFF                              ORDER and
     DEPARTMENT, et al.,                        FINDINGS & RECOMMENDATIONS
14
            Defendants.
15   _____/

16          Previously pending on this court's law and motion calendar for November 2,

17   2006, were defendants' motion for summary judgment and plaintiff's cross-motion for summary

18   judgment, both made pursuant to Fed. R. Civ. P. 56.  Plaintiff Henry John Muller III appeared

19   and represented himself; Jeri L. Pappone appeared on behalf of defendants.  This action, in which

20   plaintiff is proceeding pro se, is referred to the undersigned pursuant to E.D. Cal. L.R. 72-

21   302(c)(21).  Trial is scheduled to commence April 24, 2007, before the district judge.

22   I.  BACKGROUND

23          This case is proceeding on the first amended complaint, filed November 30,

24   2005.[1]  Plaintiff asserts that on the evening of July 11, 2003, Sacramento County Deputy Sheriffs

25   _____

26          [1] On October 23, 2006, the court denied plaintiff's motion to file a second amended
     complaint but approved the parties' stipulation substituting Deputy Sheriff Kristina Mendoza

                                                  1

1  Kristina Mendoza Albright and Rebecca Jean Eubanks went to plaintiff's home in response to a

2  telephone call from plaintiff's ex-wife stating that plaintiff may be suicidal, and these officers

3  attempted to persuade plaintiff to accompany the deputies to the Sacramento County Mental

4  Health Treatment Center for psychological evaluation.  Plaintiff asserts the deputies coerced him

5  into being escorted to the Treatment Center under threat of handcuffing and a 72-hour detention

6  pursuant to California Welfare and Institutions Code section 5150, despite the deputies'

7  conclusion plaintiff did not meet the probable cause requirements for such detention but

8  consistent with the County's unwritten policy of "minimizing its liability" when investigating

9  potential suicides.  Once at the Center, plaintiff  completed the necessary paperwork, was

10  evaluated by Dr. Malek for approximately ten minutes, and told he could leave.  Plaintiff made

11  his way home, but does not recall how, and states that he became disoriented and traumatized en

12  route.  Plaintiff asserts the deputies had denied plaintiff's requests to take his wallet and light rail

13  pass, and that he did not have his keys when he finally arrived home.

14          The first amended complaint contains claims for violation of plaintiffs' civil rights

15  under 42 U.S.C. § 1983, including unlawful arrest, invasion of privacy, denial of due process and

16  equal protection, and state law claims of intentional and negligent infliction of emotional

17  distress.  Plaintiff seeks compensatory and punitive damages.

18  II. SUMMARY JUDGMENT STANDARDS UNDER RULE 56

19          Summary judgment avoids unnecessary trials in cases with no disputed material

20  facts.  See Northwest Motorcycle Ass'n v. United States Dep't of Agric., 18 F.3d 1468, 1471

21  (9th Cir. 1994).  At issue is "whether the evidence presents a sufficient disagreement to require

22  submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

23  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986).  Two steps

24  are necessary.  First, according to the substantive law, the court must determine what facts are

25  ───────────────

26  Albright for improperly named Deputy Sheriff Christina Louis Albright.

1  material.  Second, in light of the appropriate standard of proof, the court must determine whether

2  material factual disputes require resolution at trial.  See id. at 248, 106 S. Ct. 2510.

3          When the opposing party has the burden of proof on a dispositive issue at trial, the

4  moving party need not produce evidence which negates the opponent's claim.  See e.g., Lujan v.

5  National Wildlife Fed'n, 497 U.S. 871, 885, 110 S. Ct. 3177, 3187 (1990).  When the opposing

6  party has the burden of proof, the moving party need only point to matters which demonstrate the

7  absence of a genuine material factual issue.  See Celotex v. Cattret, 477 U.S. 317, 323-24, 106 S.

8  Ct. 2548, 2553 (1986).

9          If the moving party meets its burden, the burden shifts to the opposing party to

10  establish genuine material factual issues.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

11  475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).[2]  The opposing party must demonstrate that

12  disputed facts are material, i.e., facts that might affect the outcome of the suit under the governing

13  law, see Anderson, 477 U.S. at 248, 106 S. Ct. at 2510; T.W. Elec. Serv., Inc. v. Pacific Elec.

14  Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that disputes are genuine, i.e.,  the

15  parties' differing versions of the truth require resolution at trial, see T.W. Elec., 809 F.2d at 631.

16  The opposing party may not rest upon the pleadings' mere allegations or denials, but must present

17  evidence of specific disputed facts.  See Anderson, 477 U.S. at 248, 106 S. Ct. 2510.[3]  Conclusory

18  statements cannot defeat a properly supported summary judgment motion.  See Scott v.

19  Rosenberg, 702 F.2d 1263, 1271-72 (9th Cir. 1983).

20  \\\\\

21

22      [2]  The nonmoving party with the burden of proof "must establish each element of his

23  claim with significant probative evidence tending to support the complaint."  Barnett v. Centoni,
   31 F.3d 813, 815 (9th Cir. 1994) (internal quotations omitted).  A complete failure of proof on an

24  essential element of the nonmoving party's case renders all other facts immaterial, and entitles
   the moving party to summary judgment.  Celotex, 477 U.S. at 322, 106 S. Ct. at 2552.

25      [3]  A verified complaint may be used as an affidavit in opposition to the motion.

26  Schroeder v McDonald, 55 F. 3d 454, 460 (9th Cir. 1995); McElyea v. Babbitt, 833 F.2d 196,
   197-98 (9th Cir. 1987) (per curiam).

The court does not determine witness credibility.  It believes the opposing party's evidence, and draws inferences most favorably for the opposing party.  See Anderson at 249, 255, 106 S. Ct. at 2510-11, 1513.  Inferences, however, are not drawn out of "thin air," and the proponent must adduce evidence of a factual predicate from which to draw inferences.  American Int'l Group, Inc. v. American Int'l Bank, 926 F.2d 829, 836 (9th Cir.1991) (Kozinski, J., dissenting) (citing Celotex, 477 U.S. at 322, 106 S. Ct. at 2552).

        If reasonable minds could differ on material facts at issue, summary judgment is inappropriate.  See Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995).  On the other hand, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. 1356 (citation omitted).  In that case, the court should grant summary judgment.

III.  JUDICIAL NOTICE

        The court grants defendants' unopposed request to take judicial notice of (1) plaintiff's first amended (operative) complaint (hereafter "FAC"), and (2) "Sun and Moon Data" for July 11, 2003, prepared by the U.S. Department of Navy.  See Fed. R. Evid. 201 (judicially noticed facts must be "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").  Judicial notice of court records is routinely accepted (see, e.g., Valerio v. Boise Cascade Corp., 80 F.R.D. 626, 635, n.1 (N.D. Cal. 1978), aff'd, 645 F.2d 699 (9th Cir.), cert. denied, 454 U.S. 1126 (1981)), and the Navy's calculations of the times when the sun and moon rose and set on July 11, 2003, cannot reasonably be questioned.

IV.  DEFENDANTS' OBJECTIONS TO PLAINTIFF'S EVIDENCE

        Defendants object to (1) portions of plaintiff's statement of "Additional Undisputed Material Facts,"[4] and (2) Exhibits A, B, F and G to "Plaintiff's Supporting

-------

    [4]  Plaintiff's statement of  "Additional Undisputed Material Facts" is set forth in "Plaintiff's Separate Statement of Disputed and Undisputed Material Facts in Opposition to Defendants' Motion for Summary Judgment and In Support of Plaintiff's Cross-Motion for Summary Judgment and/or for Summary Adjudication of Issues" (Document #39).

1   Declaration and Exhibits in Opposition to Defendants' Motion" (Document #40).  See

2   "Defendants' Objections to Plaintiff's Evidence" (Document #47), and "Defendants' Reply to

3   Plaintiffs' Responses and to Plaintiff's Separate Statement of Material Facts In Opposition to

4   Motion for Summary Judgment" (Document #48-2).

5        A.  Plaintiff's Statement of "Additional Undisputed Material Facts"

6            Defendants assert that several of plaintiff's "Additional Undisputed Material

7   Facts" (hereafter "Plaintiff's Facts") should be ruled inadmissible because they contain

8   conclusions or opinions of plaintiff or his expert, and are therefore irrelevant under Fed. R. Evid.

9   402 ("[e]vidence which is not relevant is not admissible").  Fed. R. Civ. P. 56 requires the

10  presentation of evidentiary facts based on "personal knowledge," not opinions or conclusions.  Of

11  course, expert opinions where necessary and with proper foundation are admissible. Evidence is

12  relevant if it has "any tendency to make the existence of any fact that is of consequence to the

13  determination of the action more probable or less probable than it would be without the

14  evidence." Fed. R. Evid. 401.

15           Defendants' objections are sustained with respect to Plaintiff's Facts Nos. 23 and

16  24, both of which state plaintiff's legal conclusions.[5]

17           Defendants' objections are overruled with respect to Plaintiff's Facts Nos. 29, 35,

18  39, and 46.[6]  All of these "facts" represent plaintiff's characterization of the deposition testimony

19

20       [5]  Plaintiff's Fact No. 23:  "Defendants violated Plaintiff's rights and privileges protected
     by the Constitution, embodied in the relevant state statutory scheme, section ('5150' et. seq.) and
     some of the Sheriff's adopted customs and policies."

21       Plaintiff's Fact No. 24:  "Defendants' actions proximately caused Plaintiff General and
     Special damages."

22

23       [6]  Plaintiff's Fact No. 29:  "Despite the Plaintiff's explanation of reporting party's ulterior
     motives, the Defendant Deputies denied this possibility and Plaintiff's polite requests to be left in
     peace to recover."

24       Plaintiff's Fact No. 35:  "The plaintiff was intentionally misinformed by the Deputies that
     he met '5150' status."

25       Plaintiff's Fact No. 39:  "During the incident, the Plaintiff's neighbors had gathered and
     were gawking at the scene of the ostensible arrest of their neighbor."

26       Plaintiff's Fact No. 46:  "Under this coerced scrutiny, the Plaintiff reluctantly entered the

of Deputies Albright and Eubanks or plaintiff's version of his interaction with the deputies the

evening of July 11, 2003.  However, the remedy for arguably erroneously characterized facts is a

set of reply facts which take issue with the asserted facts.

        Also overruled is defendants' objection to the parenthetical comment set forth in

Plaintiff's Fact No. 42, which is simply an inference which can be drawn from the facts.[7]

        Defendants' objections to Plaintiff's Facts Nos. 26 and 27 are overruled.  The court

finds these statements consistent with the deputies' testimony, as described below.

**Plaintiff's Fact No. 26**:  "Defendant Deputies admit that because they saw no signs that the Plaintiff was suicidal at the time of the incident, they did not have 'probable cause' to detain him under W&I Code Section '5150.'"

Supporting Deposition Testimony of Deputy Eubanks
(17:2-17:7; 18:13-18:14, 19:9-19:14):
Q.     All right.  Was there anything that you saw immediately that would have led you to believe that there was some immediate danger to my health or safety. . .?
A.     No, no.  If there were, we would have placed you in a hold.
. . . A. Yeah.  You stated you were not suicidal at that moment, correct.
. . . Q. Okay.  Now, at the conclusion of your questioning, did you feel you had probable cause to do 5150?
A.     No.
Q.     You did not?
A.     No, or we would have.

Supporting Deposition Testimony of Deputy Albright
(13:21-14:2, 14:22-14-24)
Q:     Okay.  So you don't remember seeing anything conspicuous that would have led you to believe that there was an immediate danger to myself or safety in the home or surrounding the home or anything about my behavior?
A.     If something was obvious, then we would have placed you under a 5150 hold and transported you for a 72-hour hold.  It wouldn't have gone on a voluntary basis.
. . . A. . . . I'm sure that if you would have told us you were suicidal we would have taken you on a 5150 hold.

---

CMH clinic. . . . [Objection is only to this sentence.]

    [7] Plaintiff's Fact No. 42: "Deputy Eubanks, the transporting deputy, testified that it would have been her normal practice to drop off a person who voluntarily wanted to go to CMH, in front of the facility (i.e., she would not go inside to orient the staff on the situation and to ensure that staff were aware of the need to arrange for transportation back to Plaintiffs home following the '5150' evaluation.)."

**Plaintiff's Fact No. 27**:  "Sheriff Deputy Mendoza-Albright admitted in her deposition that she did not know that 'probable cause' applied in this circumstance and thought it only applied to criminal arrest scenarios."

Supporting Deposition Testimony of Deputy Albright (27:8-16)

Q.   You don't have any ambiguities about how to apply probable cause and assess probable cause in a situation?

A.   I don't think probable cause is even – that's goes [sic] with criminal contact.

Q.   I'm talking about a 5150.  For a 5150, you do establish probable cause, correct?

A.   I don't believe so.

Q.   To detain?

A.   I don't believe so.

Defendants' objection to Plaintiff's Fact No. 49,[8] which sets forth plaintiff's interpretation of a portion of the operative 1993 Sheriff's 5150 Operation Order, is overruled.[9] Plaintiff's interpretation is an inference which can be drawn from the Operation Order.[10]

Defendants' objection to Plaintiff's Fact No. 52[11] is also overruled.  Again, plaintiff's facts, while not the only inference which can be drawn, are a fair inference.

---

[8] Plaintiff's Fact No. 49: "On page 6, part F of the Sheriffs Operations Order, it says that if the subject is not committed to the facility, as occurred here, the Sheriff bears the responsibility of transportation. The Sheriff left the Plaintiff stranded, in violation of this order."

[9] Plaintiff initially cited page 6 of the Operations Order as set forth in Exhibit B to the Pappone Declaration; as defendants pointed out, there is no page 6.  Plaintiff then clarified that the Pappone Declaration contained the 4-page order revised January 2004; the relevant order in effect at the time of this incident was enacted in 1993, and submitted in relevant part by plaintiff in his supplemental "Supporting Declaration and Exhibits" (Document No. 51), Exhibit 5, p. 6 (excerpt).

[10] Section XI-F of the 1993 Operation Order provides in pertinent part: "If medical treatment is not required [at a hospital], and the Officer deems that the individual needs to be psychiatrically evaluated at SCMHTC, the Officer bears the responsibility for transportation and placement of the hold."  Plaintiff's "Supporting Declaration and Exhibits" (Document No. 51), Exhibit 5, p. 6 (excerpt).

[11] Plaintiff's Fact No. 52:  "The Training Manual admonishes responding Deputies to a section '5150' incident to the critical importance of meeting 'probable cause' predicates before custodial detention, otherwise a serious deprivation of liberty (i.e., fourth amendment violations) can result.  This procedure is also codified in W&I section 5150.  Yet, the defendant deputies both admitted in their deposition testimony that they did not have probable cause to do a '5150' protective custody hold, and nevertheless detained Plaintiff."

7

Defendants' objections to Plaintiff's Fact Nos. 55, 57, 60, 70, and 72 [12] are sustained; each of these purported facts is legally conclusive.  Objections to 61, 62 and 62 are overruled.

Defendants' objections to the last sentence of Plaintiff's Fact No. 67 are overruled but require special mention.  The sentence objected to provides, "[Lt. Petrie] thus failed to conduct an investigation which included questioning of responding deputies."  While it is reasonable to infer, based upon both Lt. Petrie's deposition testimony and her letter in response to plaintiff's citizen complaint, that Lt. Petrie at no time questioned Deputies Eubanks or Albright, Lt. Petrie ultimately testified to a lack of recollection.  Similarly, it is reasonable to infer, based upon the same evidence, that Lt. Petrie did not investigate this incident beyond the information provided by plaintiff.  Again, unless there is no basis in fact for the inference, one does not object;

_____

[12]  Plaintiff's Fact No. 55:  "The responding deputies coerced, deceived and detained Plaintiff without probable cause, or compliance with the [C]onstitution and section '5150,' but in compliance with the above referenced section of the Training Manual [section 12E, purportedly authorizing deception in achieving the cooperation of a potential 5150 detainee]."

Plaintiff's Fact No. 57:  "W & I section 5157 (b), section 5325 and decisional authority, see Triplett supra, also provide that a putative detainee, even under involuntary '5150' detention, may bring some personal effects, such as his money.  Despite this legal mandate, the deputies denied the Plaintiffs repeated requests to take his wallet and light rail pass."

Plaintiff's Fact No. 60:  "Section 5153 is designed to ensure to the extent possible, a putative detainee's constitutional right to privacy.  However, the Departments policy referenced in #59 above, violates a putative detainee's constitutional right to privacy."

Plaintiff's Fact No. 61 [second sentence only]:  ". . . Yet, the deputies through their actions caused the Plaintiff stress and trauma and ignored his imploring request to be allowed to recover in peace."

Plaintiff's Fact No. 62 [second and third sentences only]:  ". . . The evidence supports that this was a routine response, by a non-family member, reporting her perceptions of suicidal ideation, and that there was no evidence whatsoever of violence or intended violence.  Yet, the Defendant Deputies denied the Plaintiff's explanation concerning the reporting party's ulterior motives."

Plaintiff's Fact No. 65:  "Lt. Petrie, a senior Bureau Commander with Sacramento County Sheriff Internal Affairs, after reading the Plaintiff's complaint, and a summary of Plaintiff's salient facts, testified that 'it did not cause [her] concern.'"

Plaintiff's Fact No. 70:  "Until the Defendants resolve the administrative complaint, dismissal of Plaintiff's State claims are premature."

Plaintiff's Fact No. 72: "Any officer, qualified for P.C. Section 830 peace officer status would have had rudimentary training that the use of coercion and deception to override consent in a warrantless detention scenario violates clearly established U.S. constitutional strictures."

1   one disputes the drawn inference with another inference fairly drawn.

2           Defendants' objections to Plaintiff's Facts Nos. 63, 64, and 73,[13] which plaintiff

3   concedes are inappropriately conclusive (see Plaintiff's Reply to Defendants' quibbles, at p. 10),

4   are also sustained.

5           Finally, defendants "object," based on Fed. R. Evid. 602 (lack of personal

6   knowledge) to plaintiff's parsing of Defendants' Undisputed Material Fact No. 5.  Plaintiff's

7   response to this proposed fact, like his responses to Defendants' Facts Nos. 1, 6-8, 11, 13, 15, 17-

8   19, takes issue with defendants' wording and the inferences to be drawn therefrom, but does not

9   state an explicit objection.  Defendants' objection merely heightens this quibble.  In recognition of

10  these differences, the court has relied only on those facts which are clearly undisputed.

11  Accordingly, defendants' objection to plaintiff's response to defendants' fact No. 5 is overruled.

12          B.  Exhibits to Plaintiff's Initial Declaration

13          Defendants object to Exhibits A, B, F and G of "Plaintiff's Supporting Declaration

14  and Exhibits in Opposition to Defendants' Motion" (Document #40).  For the following reasons,

15  these objections are overruled.

16          Defendants first object to plaintiff's Exhibit A, entitled "Material Facts of Case,"

17  as irrelevant under Fed. R. Evid. 402 because the document (1) appears incomplete since it begins

18  on page "3;" and (2) contains several statements that are inherently speculative, opinionated or

19  conclusive (see "Defendants' Objections to Plaintiff's Evidence" (Document #47), at p. 3).

20  \\\\\

21

22          [13]  Plaintiff's Fact No. 63:  "The Defendant Deputies violated each of these Department's
    adopted training manuals, operations orders, other customs and policies [en]umerated in
23  additional statements 48-53, 55-57, & 60-62 in their actions."
            Plaintiff's Fact No. 64:  "The policies or customs adopted by the Sheriff in numbers nos.
24  54, 58, and 59 above were in derogation of the U.S. Constitution and section 5150."
            Plaintiff's Fact No. 73:  "The Defendant Sheriff Deputies, in their conduct, violated these
25  well established constitutional strictures (4th and 14th amendments), the statutory scheme
    implicating the proscriptions (5150 et. seq.) and the Sheriff's own adopted customs, manuals,
26  operations order, and policy."

1      Defendants' objection to plaintiff's Exhibit A is overruled.  While the exhibit

2  commences with page three, is appears to be a complete document.  Additionally, plaintiff has

3  attested under penalty of perjury that the facts set forth in Exhibit A are "a true and correct,

4  original version, of the facts of this incident."[14]  Any factual or legal conclusions contained therein

5  that are outside of plaintiff's personal knowledge are not relevant in determining the parties'

6  motions for summary judgment.

7      Defendants object to plaintiff's Exhibit B, plaintiff's "Expert Witness Disclosure"

8  made pursuant to Fed. R. Civ. P. 26, on the ground that it contains legal conclusions and is

9  "inherently biased and prejudicial," because plaintiff's expert is also his brother, a lawyer with

10  expertise in law enforcement procedures.  Defendants cite only Evers v. General Motors, 770 F.2d

11  984, 986 (11th Cir. 1985), which the court finds inapposite.  In Evers, the Eleventh Circuit

12  affirmed the District Court's grant of summary judgment on the ground that the affidavit of

13  appellant's expert set forth conclusory allegations unsupported by specific facts of record.  This is

14  not the contention of defendants herein; nor are the shortcomings of the Evers affidavit evident

15  here.  Plaintiff's expert expressly relies on, inter alia, the deposition testimony of Deputies

16  Albright and Eubanks, and relevant portions of defendants' training manuals.  Noting the "wide

17  discrepancy in the material facts between the plaintiff and the Sheriff Deputy defendants,"

18  plaintiff's expert states his legal opinion regarding the appropriate procedures to follow when law

19  enforcement is investigating a potential 5150 detention and, based on plaintiff's statement of

20  facts, the perceived shortcomings in this case.  This affidavit meets the general criteria for expert

21  opinion testimony, as set forth in Fed. R. Evid. 702 through 705.  To the extent the legal

22  conclusions of plaintiff's expert rest on disputed material facts, or are allegedly biased, the

23

24      [14]  Although plaintiff's first amended complaint is not verified, he has filed this verified
declaration entitled "Material Facts of Case" (Exhibit A to Declaration filed August 24, 2006
25  (Document #40), and incorporated by reference the "Factual Background" and "Preliminary
Sta6tement" set forth in his Opposition to Summary Judgment (Declaration, at p. 1, referencing
26  Opposition and Cross-Motion filed August 24, 2006 (Document #38)).

1    opinion itself may simply fall into the disputed category.

2              Accordingly, defendants' objection to plaintiff's Exhibit B is overruled.

3              Finally, defendants object to the "incompleteness" of Exhibits F & G to the extent

4    that referenced portions of these exhibits were not included in the filed papers.  Exhibit F contains

5    excerpts from the Sheriff 'sTraining Manual entitled "You and the Mentally Ill," while Exhibit G

6    contains statutes from the California Welfare and Institutions Code.  Defendants do not identify

7    the purported omissions although the court notes that plaintiff references at least one statute he

8    incorrectly represents is contained in Exhibit G.  However, legal citations are readily accessible

9    from original sources.  Exhibit F is incomplete in its entirety but not as referenced by plaintiff, and

10   defendants have chosen not to supplement the record with a complete copy of the manual.  Any

11   material omission from Exhibits F or G that is not otherwise available shall be disregarded and is

12   therefore not relevant in determining the parties' motions for summary judgment.

13             Accordingly, defendants' objections to plaintiff's Exhibits F and G are overruled.

14   V.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

15        A.  Facts

16             The following facts are undisputed.  On the evening of July 11, 2003, Sacramento

17   County Deputy Sheriffs Kristina Mendoza Albright and Rebecca Jean Eubanks went to plaintiff's

18   home in response to a telephone call from plaintiff's ex-wife stating that plaintiff may be suicidal.

19   The deputies were in uniform and traveled in a marked patrol car.  The deputies arrived at

20   plaintiff's home at about 6:15 p.m., and spoke with plaintiff on his front porch.  In response to the

21   deputies' questions, plaintiff conceded he was depressed and taking antidepressant medication,

22   but stated he was not suicidal.  At 6:51 p.m., after locking plaintiff's home, Deputy Eubanks

23   transported plaintiff to the Sacramento County Mental Health Treatment Center for purposes of

24   obtaining a psychological evaluation.  Deputy Eubanks dropped off plaintiff at the Center at 6:59

25   p.m.  Plaintiff entered the Center and completed a "Triage Information Sheet."  Plaintiff was seen

26   by Dr. Malek at 7:40 p.m., for a period of about ten minutes, then told he could leave.

1    The parties dispute whether plaintiff voluntarily agreed to accompany the deputies

2  to the Treatment Center.  Plaintiff asserts the deputies coerced him into "agreeing" to be escorted

3  under threat of detention pursuant to Welfare and Institutions Code section 5150, despite the

4  deputies' conclusion that plaintiff did not meet the probable cause requirements for such detention

5  but consistent with the County's policy or practice of "minimizing its liability" when investigating

6  potential suicides.  Undisputed facts in support of plaintiff's allegations include the deputies'

7  testimony that plaintiff stated he was not suicidal, did not appear suicidal, and the deputies did not

8  have probable cause to detain plaintiff under § 5150.  Plaintiff also asserts he repeatedly informed

9  the deputies that his ex-wife's motives were malicious due to a child custody dispute.  However,

10  defendants assert that plaintiff accompanied the deputies voluntarily, relying on plaintiff's

11  acknowledgment he did not object when walking to the patrol car; the parties dispute whether

12  plaintiff was responding with futility to the deputies' ultimatum or merely accepting the deputies'

13  offer of transportation.

14    The parties also dispute whether the deputies were obliged to ensure plaintiff's safe

15  return home.  Plaintiff does not recall how he got home that evening but states that he walked

16  "some distance" in unfamiliar areas, that he was frightened and traumatized, that he was hit by a

17  car, and that when he finally did arrive home, he did not have his keys.  Plaintiff asserts the

18  deputies had earlier denied his requests to take his wallet, light rail pass and medications.  At the

19  hearing, plaintiff stated that Treatment Center staff may have offered plaintiff a bus pass but

20  plaintiff was unfamiliar with the routes.

21    Plaintiff seeks damages against each defendant in the amount of $500,000

22  compensatory and $100,000 punitive, for the alleged violation of his Fourth Amendment, due

23  process and privacy rights resulting in the exacerbation of his depression and a prolonged

24  recovery period; loss of wages, benefits and related economic injury; loss of association and

25  custody of his children for a period of eleven months; and legal expenses associated with

26  recovering his custodial rights.

B.  <u>State Claims</u>

Defendants seek summary judgment on plaintiff's second, third, and fourth causes

of action for failure to comply with the California Tort Claims Act.[15]  These state claims are:

Second:      Intentional Infliction of Emotional Distress
Third:       Negligent Arrest/False Imprisonment/Invasion of Privacy
Fourth:      Conspiracy to Violate State Law

The Act provides in pertinent part that "[a] claim relating to a cause of action for . . . injury to

person . . . shall be presented as provided in Article 2 (commencing with Section 915) not later

than six months after the accrual of the cause of action."  Cal. Govt. Code § 911.2(a).

Plaintiff filed a citizen's complaint with the Sacramento County Sheriff's

Department but concedes, both in his papers and at the hearing, that he did not comply with the

claims presentation requirements of the Act.  Accordingly, at the hearing, plaintiff offered to drop

these causes of action.

For these reasons, summary judgment should be granted on behalf of defendants on

plaintiff's second, third and fourth causes of action.

C.  <u>Sheriff Lou Blanas</u>

Defendants seek summary judgment on behalf of Sheriff Lou Blanas on the ground

that he is sued only in his official capacity and plaintiff has failed to allege facts to support

supervisorial liability.

\\\\\

---

[15]  "The Tort Claims Act provides that a public entity is not liable for an injury '[e]xcept as otherwise provided by statute' (Gov.Code, § 815).  ( <u>Zelig v. County of Los Angeles</u> (2002) 27 Cal.4th 1112, 1127, 119 Cal.Rptr.2d 709, 45 P.3d 1171.)  The purpose of the Tort Claims Act is not to expand the grounds for public entity liability, but to restrict those grounds to "'rigidly delineated circumstances.'" ( <u>Id</u>. at p. 1127, 119 Cal.Rptr.2d 709, 45 P.3d 1171.)  Under the Tort Claims Act, public employees generally are liable for injuries caused by their acts or omissions to the same extent as private persons. (Gov.Code, § 820, subd. (a.)).  A public entity is vicariously liable for an injury proximately caused by an act or omission of its employee within the scope of employment if the act or omission would give rise to a cause of action against the employee. (Gov.Code, § 815.2, subd. (a.).)  But a public entity is not vicariously liable if the employee is immune from liability. ( Id., subds. (a), (b))."  <u>Richards v. Department of Alcoholic Beverages Control</u>, 139 Cal.App.4th 304, 317, 42 Cal.Rptr.3d 782, 790 (Cal. App. 2nd Dist. 2006).

1    Supervisory personnel are generally not liable under § 1983 for the actions of their

2    employees under a theory of respondeat superior and, therefore, when a named defendant holds a

3    supervisorial position, the causal link between him and the claimed constitutional violation must

4    be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979); Mosher v.

5    Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978), cert. denied, 442 U.S. 941 (1979).  Vague and

6    conclusory allegations concerning the involvement of official personnel in civil rights violations

7    are not sufficient.  See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).  Thus, "[a]

8    supervisor may be liable if there exists either (1) his or her personal involvement in the

9    constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful

10   conduct and the constitutional violation."  Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989).

11   "Liability under section 1983 arises only upon a showing of personal participation by the

12   defendant.  A supervisor is only liable for constitutional violations of his subordinates if the

13   supervisor participated in or directed the violations, or knew of the violations and failed to act to

14   prevent them."  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) (citations omitted).

15   "Supervisory liability exists even without overt personal participation in the offensive act if

16   supervisory officials implement a policy so deficient that the policy 'itself is a repudiation of

17   constitutional rights' and is 'the moving force of the constitutional violation.'"  Redman v. County

18   of San Diego, 942 F.2d 1435, 1446 (9th Cir. 1991) (quoting Hansen v. Black, 885 F.2d at 646).

19   Plaintiff named Sheriff Blanas "under the Doctrine of Respondeat Superior, in his

20   official capacity as Chief of the Sheriff Department" (FAC, at 5:12-13), and alleged that Sheriff

21   Blanas, "[a]cting . . . pursuant to official policy or custom" and "in his supervisory capacity,"

22   "knowingly, intentionally, recklessly or with gross negligence failed to instruct, supervise, control,

23   and discipline on a continuing basis" defendant deputy sheriffs "to refrain" from their alleged

24   unconstitutional conduct (FAC, at pp. 5, 16).  However, at the hearing plaintiff conceded he has

25   no evidence in support of his claim that Sheriff Blanas was personally involved in the alleged

26   deprivation of plaintiff's rights or in the implementation of a policy promoting the alleged

1  deprivation.  Thus, plaintiff agreed to drop Sheriff Blanas as a defendant.

2        As defendants assert, naming Sheriff Blanas in his official capacity serves as a

3  vehicle for suing the County of Sacramento.  See, Kentucky v. Graham, 473 U.S. 159, 166, 105

4  S.Ct. 3099, 3105 (1985) ("As long as the government entity receives notice and an opportunity to

5  respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against

6  the entity. . . . It is not a suit against the official personally, for the real party in interest is the

7  entity"); see also, Monell v. Department of Social Services, 436 U.S. 658, 691, n. 55; 98 S.Ct.

8  2018, 2036, n. 55 (1978) ("local government officials sued in their official capacities are 'persons'

9  under § 1983 in those cases in which . . . a local government would be suable in its own name").

10  Since plaintiff has failed to demonstrate a basis for asserting liability against Sheriff Lou Blanas

11  distinct from that against Sacramento County, the court recommends summary judgment be

12  granted on behalf of Sheriff Lou Blanas.

13        D.  Sacramento County

14        Defendants assert summary judgment should be granted in their favor on

15  plaintiff's claims against Sacramento County, on the ground that plaintiff has failed to

16  demonstrate any unconstitutional policy, practice or custom in instructing, supervising, controlling

17  or disciplining County officers that led to any violation of plaintiff's constitutional rights.

18        "[L]ocal governments, like any other § 1983 'person,' . . . may be sued for

19  constitutional deprivations visited pursuant to governmental 'custom' even though such a custom

20  has not received formal approval through the body's official decisionmaking channels."  Monell

21  v. Department of Social Services, 436 U.S. 658, 690-91, 98 S.Ct. 2018, 2036 (1978).  "[P]laintiff

22  must allege that the action inflicting injury flowed from either an explicitly adopted or a tacitly

23  authorized city policy.  Monell, at 690-91, 98 S.Ct. at 2035-36; Harris v. City of Roseburg, 664

24  F.2d 1121, 1130, 1338 (9th Cir.1981) ("'Official policy' within the meaning of Monell

25  [encompasses situations] where a municipality 'impliedly or tacitly authorized, approved, or

26  encouraged' illegal conduct by its police officers.'") (quoting Turpin v. Mailet, 619 F.2d 196, 201

15

(2nd Cir.), cert. denied, 449 U.S. 1016, 101 S.Ct. 577 (1980)).” Gibson v. U.S., 781 F.2d 1334, 1337-1338 (9th Cir. 1986); see also, Ortez v. Washington Cty., 88 F.3d 804, 811 (9th Cir. 1996). “Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved. But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the ‘policy’ and the constitutional deprivation.” City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-824, 105 S.Ct. 2427, 2436 (1985).

“‘[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.” Collins v. City of Harker Heights, 503 U.S. 115, 123, 112 S.Ct. 1061, 1067 (1992), quoting in Canton v. Harris, 489 U.S. 378, 109 S.Ct. 1197 (1989). Municipal liability can be established either by an unconstitutional policy, or by a policy or custom of failing to train employees where such failure causes a violation of constitutional rights demonstrating deliberate indifference. Id.

Plaintiff’s First Cause of Action, entitled “False Arrest/False Imprisonment/ Invasion of Privacy,” alleges that plaintiff was unlawfully detained in violation of his rights under the First and Fourteenth Amendments and, as a result, suffered emotional, physical and financial damages, and the loss of contact and association with his children for nearly a year. Plaintiff’s Fifth Cause of Action, entitled “Violation of U.S.C. Section 1983: Refusing or Neglecting to Prevent,” makes general allegations that Sacramento County violated plaintiff’s constitutional rights by “unlawfully and maliciously searching, arresting (detaining), and falsely imprisoning” him “pursuant to official policy or custom” or by “fail[ing] to instruct, supervise, control and

discipline" its deputies.  Plaintiff's Six Cause of Action, entitled "Violation of U.S.C. Section

1983: Unlawful Search and Seizure," asserts plaintiff was searched and detained without probable

cause and denied his property without due process.  Plaintiff's primary argument pursuant to these

causes of action, as developed at the hearing, is that plaintiff was unlawfully detained by the

deputies in furtherance of an unwritten department policy aimed at minimizing county liability in

potential suicide cases and countenanced by written policies authorizing deception and coercion.[16]

Detention of an individual pursuant to Welfare and Institutions Code section 5150

must be premised upon probable cause to believe the person is, as a result of mental disorder, a

danger to himself or others, or is gravely disabled.  Welf. & Inst. Code § 5150.[17]  Detention

---

[16]  Plaintiff also argues that defendants failed to adhere to explicit department policies and statutory guidelines as set forth in the Sheriff's Training Manual entitled "You and the Mentally Ill," Sheriff's Operations Order entitled "Mentally Disturbed Person–5150 Welfare and Institutions Code" (1993), and additional provisions of the Welfare and Institutions Code.

Plaintiff asserts defendants failed to abide by provisions of the Sheriff's Training Manual advising deputies to (1) exercise caution before depriving an individual of personal liberty pursuant to a § 5150 detention (at p. 5), (2) exercise caution in assessing the credibility of a report that a relative is suicidal (at p. 17; see also, Welf. & Inst. Code  5150.05 (family members may provide information about historical course of a person's mental disorder); (3) refrain from threatening or deceiving a mentally ill person, although there may be exceptions (at p. 12), and (4) permit a detained individual to bring a few personal items (at p. 14; consistent with Welf. & Inst. Code § 5157(b) (advisement to individual taken into custody pursuant to § 5150 shall include permission to bring a few personal items).  See Muller's first Declaration (Doc. #40), Exh. F; (Manual not provided by defendants).

Plaintiff also asserts that defendants failed to abide by provisions of the Sheriff's Operations Order (1993) that deputies (1) shall make every effort to obtain the necessary care for an individual with a minimum of psychological trauma (§ I(B)); (2) permit individuals placed in custody to bring a few personal items (§ III(B)); and (3) shall not be dispatched to the scene of an attempted suicide unless the victim is violent (§ VI).  See Pappone Decl., Exh. B (Revised Order January 2004), and Muller's second Declaration (Doc. #51), Exh. 5.

Finally, plaintiff asserts defendants failed to follow the directive of Welf. & Inst. Code § 5153 that responding officers dress in plain clothes and travel in unmarked vehicles when apprehending a person pursuant to § 5150.

As discussed infra, resolution of these arguments and determination whether they rise, or are related, to any violation of plaintiff's constitutional rights depends on threshold factual findings that cannot be addressed on summary judgment.

[17]  Welf. & Inst. Code § 5150 provides in full:

When any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, member of the attending staff, as defined by regulation, of an evaluation facility designated by the county,

1  pursuant to § 5150 is analogous to a criminal arrest and must be supported by probable cause.

2  Maag v. Wessler, 960 F.2d 773, 775-76 (9th Cir. 1992).

3        Both defendant deputies testified they did not have probable cause to detain

4  plaintiff pursuant to § 5150.  See discussion, supra, overruling defendants' objections to

5  Plaintiff's Fact No. 26.

6        Plaintiff argues that he was effectively detained because he was coerced into

7  "agreeing" to accompany the deputies pursuant to their threat he met the requirements of § 5150

8  and would otherwise be handcuffed and detained for 72 hours.  Plaintiff asserts this conduct was

9  consistent with the County's unconstitutional "sub rosa" policy of "minimizing liability" in

10  potential suicide cases,[18] and is supported, inter alia, by (1) Deputy Eubank's statement to plaintiff

11  "that the reason I was being detained and transported to CMH was . . . to minimize potential

12  Sheriff Department liability in potential suicide scenarios") ("Plaintiff's Supporting Declaration"

13  (Document #40), Exh. A, at p 4;  (2) the testimony of Deputy Eubanks that she was acting

14  consistently with her training ("I was doing exactly what I was trained to do . . . . There's no way

15  everything in those manuals is exactly what I did") (Muller Decl., Exh. D, excerpt 32:12-21); (3)

16  the October 27, 2004 letter from Internal Affairs Bureau Commander Lieutenant Tracy Petrie in

17  

18       designated members of a mobile crisis team provided by Section 5651.7, or other
    professional person designated by the county may, upon probable cause, take, or

19       cause to be taken, the person into custody and place him or her in a facility
    designated by the county and approved by the State Department of Mental Health

20       as a facility for 72-hour treatment and evaluation.

21       Such facility shall require an application in writing stating the circumstances
    under which the person's condition was called to the attention of the officer,

22       member of the attending staff, or professional person, and stating that the officer,
    member of the attending staff, or professional person has probable cause to

23       believe that the person is, as a result of mental disorder, a danger to others, or to
    himself or herself, or gravely disabled. If the probable cause is based on the

24       statement of a person other than the officer, member of the attending staff, or
    professional person, such person shall be liable in a civil action for intentionally

25       giving a statement which he or she knows to be false.

26    [18]  Alternate nomenclature attributed at the hearing to this policy was "better safe than
    sorry" and "when in doubt haul them out."

response to plaintiff's Citizen's Complaint, stating that the deputies' "acted within policy" and "no further action" was required (Pappone Decl., Exh. F); (4) the testimony of Lt. Petrie supporting the offer of a "choice" to potential 5150 detainees whether to be detained or proceed voluntarily, stating, "if they're right on the edge and it can go either way, there's a lot of discretion, a lot of gray area in law enforcement, so it did not cause me concern" (Pappone Decl., Exh. G, excerpt 30:1-20); and (5) portions of the Sheriff's Training Manual endorsing occasional deception of mentally ill persons and quick action including the "removal of means" (see Manual, at pp. 12 and 17 ("It is wrong to deceive a mentally ill person (there are exceptions)," and "Take action.  Remove means." ) (Muller Decl. (Doc. #40), Exh. F).

        Defendants assert the assessment of potential 5150 detainees is a "gray area," and make the following alternate and contradictory arguments:  first, that plaintiff accompanied the deputies voluntarily; second, that if the deputies deceived plaintiff, their intent was solely altruistic; and third, notwithstanding their testimony to the contrary, the deputies had probable cause to detain plaintiff (based upon the telephone call from plaintiff's ex-wife, plaintiff's statement he was depressed, plaintiff's near-tearful demeanor upon questioning, and plaintiff's acquiescence in walking to the patrol car[19]), and would have detained plaintiff had he not agreed to accompany defendants.  Defendants also argue that defendant deputies have no disciplinary history and had no prior complaints regarding improper 5150 evaluations or detentions; that there is no evidence these officers were inadequately trained, supervised, disciplined or controlled by the County; and that defendant deputies have been certified pursuant to the Peace Officer's

\\\\

\\\\

---

[19]  Defendants rely on their Undisputed Fact No. 8, which provides:  "Plaintiff alleges that he did not verbally respond to the officers' offer, but physically went with them to the patrol car." The evidence cited in support of this fact is plaintiff's first amended complaint, which provides: "While I never openly consented to voluntary protective custody, I heard Officers 'call it in' to their supervisor as a 'voluntary' hold.  I did not say anything but I did not feel as though I had any reasonable choice in the matter."  FAC, p. 9, ¶ 23.

1  Standards and Training (P.O.S.T.), which includes training with respect to "5150 holds."[20]

2       The parties' respective positions demonstrate that resolution of plaintiff's claims

3  against the county depends upon the resolution of material factual disputes that cannot be made on

4  summary judgment, particularly whether plaintiff accompanied the deputies voluntarily or

5  pursuant to an unfounded threat of detention and, if the latter, whether such threat was made

6  pursuant to departmental policy.

7       Accordingly, defendants' motion for summary judgment on plaintiff's first, fifth

8  and sixth causes of action against Sacramento County should be denied.

9       E.  The Deputies and Qualified Immunity

10       Defendants contend that Deputies Eubanks and Albright are qualifiedly immune

11  from liability pursuant to plaintiff's allegations he was unlawfully searched and detained in

12  violation of the Fourth Amendment.

13       "A private right of action pursuant to 42 U.S.C. § 1983 exists against law

14  enforcement officers who, acting under the color of authority, violate federal constitutional or

15  statutory rights of an individual.  See Wilson v. Layne, 526 U.S. 603, 609 (1999).  The defense of

16  qualified immunity, however, shields an officer from trial when the officer "reasonably

17  misapprehends the law governing the circumstances she confronted," even if the officer's conduct

18  was constitutionally deficient.  Brosseau v. Haugen, 543 U.S. 194 (2004) (per curiam)."  Motley

19  v. Parks, 432 F.3d 1072, 1077 (9th Cir. 2005).  "In Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151,

20  150 L.Ed.2d 272 (2001), the Supreme Court laid out the framework for determining an officer's

21  entitlement to qualified immunity.  The threshold inquiry requires a court to ask, '[t]aken in the

22  light most favorable to the party asserting the injury, do the facts alleged show the officer's

23  conduct violated a constitutional right?'  Id. at 201, 121 S.Ct. 2151.  The inquiry ends at this stage

24  if no constitutional right is found to have been violated; the plaintiff cannot prevail.  Id.  If, on the

25  _____

26       [20]  Defendants provide introductory P.O.S.T. materials but no pertinent excerpts.  See
Pappone Decl., Exh. C.

1   other hand, the plaintiff's allegations do make out a constitutional injury, then the court must

2   determine whether that constitutional right was clearly established at the time of the violation. Id.

3   If the right was not clearly established, the qualified immunity doctrine shields the officer from

4   further litigation.  Id.  Finally, even if the violated right was clearly established, the Saucier court

5   recognized that it may be difficult for a police officer fully to appreciate how the legal constraints

6   apply to the specific situation he or she faces.  Under such a circumstance, '[i]f the officer's

7   mistake as to what the law requires is reasonable, the officer is entitled to the immunity defense."

8   Id. at 205, 121 S.Ct. 2151."  Motley, 432 F.3d at 1077.

9         As earlier noted, detention of an individual pursuant to § 5150 is analogous to a

10  criminal arrest and must be supported by probable cause to believe that the individual is, as a

11  result of mental disorder, a danger to himself or others, or is gravely disabled.  Plaintiff argues

12  that the criteria authorizing a § 5150 detention is clearly established, and the officers knowingly

13  overreached these constitutional parameters to achieve plaintiff's "cooperation" through

14  deception, threat and coercion.

15        Defendants argue that, even assuming plaintiff's version of events, the law was not

16  clearly established because (1) they have found no case with identical facts, and, moreover, (2) the

17  language of § 5150 is discretionary (see n. 5, supra, "the county may, upon probable cause, take,

18  or cause to be taken, the person into custody"), rendering the statute permissive.  However, the

19  lack of a parallel case is not dispositive (rather, the test is reasonableness), and the discretionary

20  language of § 5150 assumes the threshold probable cause.[21]  Defendants argue, alternatively, that

21  plaintiff's decision to accompany the deputies was voluntary and therefore the Fourth Amendment

22  is not implicated; however, as discussed above, this argument rests on material factual disputes

23  that cannot be decided on summary judgment.

24  \\\\\

25

26        [21]  Indeed, the obvious interpretation of this statute is that in the absence of probable
    cause, no detention is authorized.

21

1    The undersigned recognizes that deputies face difficult decisions in determining

2    whether to detain persons who they believe pose a danger to themselves or others.  However, the

3    basis for making that difficult decision is to make a determination within the confines of state law,

4    not, if plaintiff's facts are to be believed, simply to make a determination based on "minimizing

5    liability."  Qualified immunity will often obtain for the former, and often not for the latter.

6    Accordingly, defendants' motion for summary judgment on the ground Deputies

7    Eubanks and Albright should be granted qualified immunity should be denied.

8    VI.  PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

9    Plaintiff moves for summary judgment on the ground that there is "no genuine

10   issue of material fact negating 42 U.S.C. § 1983 liability," and seeks trial solely on the issue of

11   damages.  Plaintiff's Notice of Motion, at p. 2; Plaintiff's Memorandum in Opposition to

12   Defendants' Motion for Summary Judgment and [in Support of] Plaintiff's Cross-Motion for

13   Summary Judgment, at p. 26.

14   Since there remain material factual disputes that cannot be resolved on summary

15   judgment, plaintiff's motion should be denied.

16   VII.  PLAINTIFF'S MOTION FOR LEAVE TO DESIGNATE A DAMAGES EXPERT

17   On October 23, 2006, the court deferred consideration of plaintiff's request for

18   leave to designate a damages expert until after the court's decision on the parties' motions for

19   summary judgment.  Plaintiff renewed the request at the November 2, 2006 hearing, and

20   defendants stated their opposition.

21   Discovery closed in this case on August 4, 2006; the deadline for expert witness

22   disclosures was June 21, 2006.  However, the court recognizes this case will present difficult

23   issues of standard of care, breach of duty, causation and foreseeability in assessing the amount of

24   plaintiff's damages should he prevail at trial.  For example, what was defendants' duty of care in

25   when plaintiff was dropped off at the Treatment Center, presumptively without his wallet or light

26   rail pass?  Was this duty breached?  If so, to what extent were his alleged damages reasonably

1  foreseeable?

2         Accordingly, should the district judge adopt these findings and recommendations,

3  this court further orders that (1) plaintiff's motion for leave to designate a damages expert be

4  granted, (2) defendants may also designate a damages expert, and (3) discovery reopened for a

5  limited period for the exchange of expert disclosures and expert depositions.  The details of this

6  recommendation are set forth in the conclusion below.

7  V.  CONCLUSION

8         For the reasons stated above, IT IS HEREBY ORDERED that:

9         1.  Defendants' requests for judicial notice are granted;

10        2.  Defendants' objections to plaintiff's evidence are sustained and overruled as set

11  forth above; and

12        3.  Plaintiff's request for leave to name a damages expert is granted and shall

13  proceed as follows:  Within thirty days of the court's order adopting these Findings, if such order

14  is issued, plaintiff shall (and defendants may) designate in writing, file with the court, and serve

15  upon all other parties , the identity of the  party's damages expert, in compliance with the

16  information disclosure provisions of Fed. R. Civ. P. 26 (a)(2), and make such expert available for

17  deposition within sixty days of the court's order.

18        For the reasons stated above, IT IS HEREBY RECOMMENDED that:

19        1.  Defendants' motion for summary judgment, filed August 4, 2006, should be

20  granted on plaintiff's Second, Third and Fourth Causes of Action, and denied on Plaintiff's First,

21  Fifth and Sixth Causes of Action; summary judgment should be granted on behalf of Sheriff Lou

22  Blanas; and

23        2.  Plaintiff's cross-motion for summary judgment, filed August 24, 2006, should

24  be denied.

25        These findings and recommendations are submitted to the Honorable Garland E.

26  Burrell, Jr., the United States District Judge assigned to this case, pursuant to the provisions of

Title 28 U.S.C. § 636(b)(l).  Within ten (10) days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten (10) days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:   11/29/06                              /s/ Gregory G. Hollows
_____
                                              GREGORY G. HOLLOWS
                                              U. S. MAGISTRATE JUDGE

NOW6:Muller1390.SJ